UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ALTA VISTA PRODUCTIONS, LLC, <br> and ALTA VISTA PRODUCTIONS INC. | * <br> * <br> * | Civil Action No. 10-1948 |
| versus | * <br> * | Section: "S" |
| ST. PAUL FIRE & MARINE <br> INSURANCE COMPANY | * <br> * <br> * <br> * | JUDGE LEMMON <br><br> MAGISTRATE KNOWLES |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ST. PAUL FIRE AND MARINE INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant St. Paul Fire and Marine Insurance Company ("St. Paul") respectfully submits this memorandum in support of its Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56. For the reasons stated herein, St. Paul is entitled to summary judgment dismissing the claim asserted by Alta Vista Productions, LLC and Alta Vista Productions, Inc. (collectively, "Alta Vista") arising out of the so-called "Two Week Hiatus" on the grounds that there is no coverage for this claim under the clear terms of the policy of insurance issued by St. Paul to Alta Vista.

### I.   SUMMARY OF THE ARGUMENT

This is an insurance coverage dispute arising out of the production of the motion picture The Expendables. Faced with the mere possibility of a future loss -- a possibility that it was told would "very likely" not materialize -- the insured, Alta Vista, made a unilateral (and premature) decision to incur more than $1 million in costs to avoid that potential loss. Alta Vista now seeks to pass those costs on to its insurer, St. Paul, which moves for summary judgment dismissing that claim as a matter of law.

1

## II.   BACKGROUND FACTS

Alta Vista was involved in the production of The Expendables, a motion picture starring Jason Statham and Sylvester Stallone.[1]  St. Paul issued various types of insurance policies to Alta Vista in connection with the filming and production of The Expendables, including a Motion Picture Production Package Policy bearing policy number ENT1001593, with an effective period of February 5, 2009 through February 5, 2010 (the "Policy").[2]  The Policy provides "Cast Coverage" insuring the policyholder for losses incurred when a covered artist "is prevented by their death, injury or sickness" from commencing, continuing or completing their duties or performances in a covered production.[3]  This is a first-party coverage that protects the insured against economic damages incurred when certain production periods are halted or delayed by an actor's incapacity.  The Policy does not cover losses directly or indirectly caused by Alta Vista's intentional acts, or at its direction or with its knowledge.[4]  The Policy provides three separate Cast Coverages spanning the various stages of production:  Pre-Production Cast Protection[5]; Principal Photography Cast Protection[6]; and Post-Production Cast Protection[7].

---

[1] *See, e.g.*, Alta Vista's Original Complaint, attached hereto as Ex. 1, at ¶¶ 6, 14, 24.

[2] Relevant excerpts of the Policy are attached hereto as Ex. 2; *see also* Ex. 1 at ¶¶ 6-7.

[3] *See* Ex. 2.

[4] *Id.* at "Common Exclusions – What We Will Not Cover. ("Intentional acts or direction.  We will not cover loss directly or indirectly caused from your intentional acts or at your direction or with your knowledge.")

[5] "Pre-Production" is defined as "the period of preparation before principal photography begins."  (*Id.* at "Common Definitions.")  Pre-Production Cast Coverage is applicable where a covered artist is "prevented by their death, injury or sickness from:  commencing or completing their duties or performances during the pre-production period; or commencing principal photography."  (*Id.* at "Section 1-A – Extended Pre-Production Cast Protection.")

[6] "Principal Photography" includes "the period of time during which the first camera unit completes the filming of all scenes included in the script."  (*Id.* at "Common Definitions.")  Principal Photography Cast Coverage is applicable where a covered artist is "prevented by their death, injury or sickness from commencing, continuing or completing their duties or performances in a covered production."  (*Id.* at "Section 1-B – Principal Photography Cast Protection.")

Filming of The Expendables was originally scheduled to commence in Brazil on March 30, 2009, and would continue there for approximately three weeks before shifting to New Orleans for the remainder of the production.[8] However, on March 16, 2009, approximately two weeks prior to the scheduled commencement of filming, Jason Statham was diagnosed with a growth on his throat requiring medical treatment.[9] The treating physician advised that he would first attempt to treat with antibiotics, but warned that surgery would be required if the antibiotics were ineffective.[10]

The medication used to treat Statham prevented him from flying, and thus prevented him from traveling to Brazil to begin filming as scheduled.[11] As a result of this diagnosis, on March 18, 2009 Alta Vista made the decision to delay, or "push," the start of filming in Brazil by one week (until April 6, 2009), which in turn delayed, or "pushed," the start of filming in New Orleans by one week as well (hereafter, the "One Week Push").[12] Alta Vista ultimately submitted a claim to St. Paul under the Policy's Pre-Production Cast Coverage, calculating the total costs incurred at approximately $1.1 million dollars.[13] St. Paul retained a third party

---

[7] "Post Production" is defined as the period of time immediately following the completion of principal photography. (Id. at "Common Definitions.")  Post-Production Cast Coverage is applicable where a covered artist is "prevented by their death, injury or sickness from commencing or completing their duties during the post-production period." (Id. at "Section 1-C – Post Production Cast Protection.")

[8] Ex. 1 at ¶ 12.

[9] June 25, 2009 letter from Alta Vista Productions, LLC to Neil Gibson, attached hereto at Ex. 3, at ST. PAUL 000010.

[10] Id. at ST. PAUL 000011.

[11] March 19, 2009 email from Brian Etkin to Varma Singh, attached hereto as Ex. 4, at ST. PAUL 001482.

[12] March 19, 2009 email from John Thompson to Claude Forest and others, attached hereto as Ex. 5, at ST. PAUL 000639 ("[W]e have decided, as I mentioned to you last night, to push the start date of the picture, one week, from March 30 to April 6, 2009.").

[13] See Alta Vista's Claim Submission, relevant excerpts of which are attached hereto as Ex. 6, at ST. PAUL 000685-86.

adjuster, Crawford and Company, to assist with the adjustment of that portion of the claim attributable to the One-Week Push, and in March 2010, St. Paul made a payment to Alta Vista in the amount of $528,978.18 on the One-Week Push claim.[14] Although Alta Vista seeks additional amounts related to the One-Week Push claim, St. Paul is not moving for summary judgment on that claim at this time.

On March 23 it was determined that the antibiotics had been ineffective and that Statham would require minor surgery.[15] The surgery was performed without complication on March 24, and Statham was put on strict voice rest pending the results of a pathology report.[16]

On April 1, after the pathology report revealed that the lesion was benign, Statham's doctors cleared him to travel to Brazil to begin filming. Although a follow-up visit would be required upon his return from Brazil on or around April 27, Statham's doctors expressed their collective belief -- as detailed below -- that he would be able to continue and complete filming as scheduled, without any additional delays:

- Dr. Gerald Berke, Chief of UCLA's Division of Head and Neck Surgery, summarized as follows: "I think in the case of Mr. Statham it is quite fitting to allow him to travel at this time and I think he will continue to heal over the next three weeks. At the end of this time period we plan on seeing him back in Los Angeles. <u>It is highly likely at that time that he should be able to continue with the remainder of his filming for the following six weeks without any additional intervention.</u>"[17] (Emphasis added.)

- Dr. Paula Schoen reiterated that Statham "should be able to continue the film without problem" and went on to confirm that as long as the follow-up visit did not indicate

---

[14] *See* March 8, 2010 report from Crawford & Company to Mark Goodall, attached hereto as Ex. 7, at ST. PAUL 000999.

[15] Ex. 3 at ST. PAUL 000011.

[16] *See* March 24, 2009 email from Dr. Joseph Sugerman to Neil Gibson and Claude Forest, attached hereto as Ex. 8, at ST. PAUL 001499.

[17] *See* April 1, 2009 letter from Dr. Gerald Berke to Dr. Joseph Sugerman, attached hereto Ex. 9, at ST. PAUL 000698-99. (Emphasis added.)

4

that Statham would need an additional procedure upon his return from Brazil, "there would be no issue at all regarding his voice for the second part of the movie."[18]

- Dr. Joseph Sugerman issued a similar prognosis: "[Statham] is ready to leave for Brazil. Upon his return we will examine his vocal cords. It is VERY unlikely that he would require any extensive surgery at that time, but might need an in office laser treatment. If that were needed he could speak in approximately 14 days, and could act without speaking almost immediately."[19] (Emphasis in original).

Importantly, Alta Vista has confirmed that the opinions expressed in the three letters identified above -- Exs. 9, 10 and 11 – were the only evidence it had upon which to base the decision to declare the Two-Week Hiatus.[20] There is nothing in these letters to suggest that Statham would be unable to continue his filming duties as scheduled, and Alta Vista has admitted that its understanding was that the "most likely outcome" of Statham's follow-up examination was that "there w[ould] be no further action or treatment required."[21] Indeed, even if further treatment was required, Dr. Berke went so far as to say that such treatment "probably can wait until he [Statham] is finished production with his current movie project."[22]

Notwithstanding these positive prognoses, on April 1, 2009, Alta Vista made the unilateral election to build in an additional two-week delay, this time delaying principal

---

[18] *See* April 1, 2009 letter from Dr. Paula Schoen to Claude Forest, attached hereto as Ex. 10, at ST. PAUL 000507.

[19] *See* April 2, 2009 letter from Dr. Joseph Sugerman to unknown recipient, attached hereto as Ex. 11, at ST. PAUL 000492.

[20] *See* January 25, 2010 email from Trevor Short to Neil Gibson, attached hereto as Ex. 12, at ALT 000213 ("The only 'documented proof from physicians on his condition' that we did and do have access to, and upon which we had to rely in making our decision to impose the 'hiatus,' are the three medical reports which we submitted to the insurers in April 2009. . . . The Production had to make its decisions regarding the filming of the picture based on the information available at the time as contained in the medical opinions attached." (Emphases added.)

[21] *See* April 1, 2009 letter from Trevor Short to Claude Forest, attached hereto as Ex. 13, at ST. PAUL 00015 - 16 ("[W]e have been advised by a number of medical experts, including those attending to Mr. Statham[,] that the most likely outcome of the removal of the growth which was discovered on his throat is that there will be no further action or treatment required – certainly for the period which concerns us in relation to the Picture.").

[22] *See* Ex. 9 at ST. PAUL 000699.

photography between the end of filming in Brazil and the beginning of filming in New Orleans (hereafter, the "Two-Week Hiatus").[23] When it informed St. Paul of its decision, Alta Vista admitted that it made the decision to schedule the Two-Week Hiatus not on the basis of medical evidence indicating that Statham would be unable to perform, but instead "to cater for" the "highly unlikely" "worst case scenario" that Statham would be unable to continue filming as scheduled.[24] Notably, Alta Vista declared the hiatus more than <u>three weeks before </u>Statham's scheduled follow-up visit would reveal whether any additional treatment would in fact become necessary.[25] (That visit ultimately confirmed the doctors' positive prognoses, i.e. that no further treatment was necessary.[26])

Alta Vista submitted an additional claim for the losses it alleges it suffered as a result of its April 1 decision to declare the Two-Week Hiatus. Alta Vista claims that it suffered approximately $1,050,000 in losses as a result of that Hiatus. St. Paul has denied coverage for the Two-Week Hiatus claim in its entirety, as Alta Vista has not presented any evidence showing that Statham was prevented from performing as required by the Policy.

### III. ST. PAUL IS ENTITLED TO SUMMARY JUDGMENT ON THE TWO-WEEK HIATUS CLAIM

As demonstrated below, Alta Vista's decision to declare the Two-Week Hiatus was admittedly made in the face of unanimous and uncontroverted evidence indicating that Statham would in fact be able to complete filming as scheduled. Furthermore, the decision to declare the

---

[23] Ex. 13, at ST. PAUL 00016 ("In order to cater for this worst case scenario we have arranged a hiatus in the production of the Picture for the period between the end of shooting in Brazil on April 27, 2009 and the start of shooting in New Orleans on May 11, 2009.").

[24] *See id.*

[25] *See id.*

[26] *See* June 17, 2009 letter from Dr. Berke to Claude Forest, attached hereto as Ex. 14, at ST. PAUL 000033.

Two-Week Hiatus was made more than three weeks before Statham's follow-up visit would determine if additional treatment -- and potential filming delays associated with that treatment -- would even be necessary.  Under these circumstances, any damages realized as a result of Alta Vista's decision to declare the Two-Week Hiatus are not covered under the Policy, and St. Paul is entitled to summary judgment dismissing this claim as a matter of law.

A.   **The Summary Judgment Standard**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if no genuine issue of material fact exists, and the moving party is entitled to summary judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). Substantive law determines the materiality of facts, and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  Once the movant establishes the absence of genuine issues of material fact, the non-movant must produce specific facts and support its claim by more than a mere scintilla of colorable evidence.  *Id.* at 252.  General allegations or unsupported assertions of material fact are inadequate to satisfy the non-movant's burden and the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Kee v. City of Rowlett, Texas,* 247 F.3d 206, 210 (5th Cir. 2001).

B.   **Choice of Law**

The parties have previously disputed the substantive law applicable to this dispute, as both Canada and Louisiana have contacts with this litigation.  Despite this fact, St. Paul submits

that a choice of law analysis is not necessary here because there is no material conflict between the laws of Canada and those of Louisiana as applied to this particular issue.

Federal courts apply the forum state's conflict-of-law rules to determine what law governs state-law claims. *See, e.g., Bailey v. Shell Western E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Under Louisiana choice of law principles, if there is no conflict between the relevant jurisdictions, meaning that there is no substantive difference in the application of the relevant legal principles at issue in the case, no further analysis is necessary, and the court will apply Louisiana law. *See, e.g., Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 286 n.2 (5th Cir. 2009).

This case involves the interpretation of an insurance policy. Under Louisiana law, the words of an insurance policy must be given their generally prevailing meaning, and when those words are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. *See, e.g.*, *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003): La. Civ. Code arts. 2046-47. Similarly, under Canadian law, when the language of a policy is unambiguous, the court should give effect to that clear language. *See, e.g.*, *Progressive Homes Ltd. v. Lombard Gen. Ins. Co. of Canada*, 2010 CarswellBC 2501, ¶ 22 (Canadian Supreme Court, 2010). Because there is no material difference between the laws of the two interested jurisdictions with respect to the interpretation of an insurance policy, there is no conflict of laws and the Court should therefore apply Louisiana law. *Am. Elec.*, 556 F.3d at 286 n.2.

C.   **There is No Coverage Under the Policy Because There is No Evidence that Jason Statham was Actually Prevented from Performing**

Louisiana law requires the insured to carry the burden to prove that the terms of the insuring agreement have been satisfied. *See, e.g., Tunstall v. Stierwald*, No. 2001-1765 (La.

2/26/02), 809 So.2d 916, 921 ("the insured bears the burden of proving the existence of the policy and coverage.")  The burden only shifts to the insurer if it attempts to negate coverage by relying on a policy exclusion.  *Id*.  In this case, St. Paul does not rely on any policy exclusion, and the burden is therefore on Alta Vista to demonstrate the existence of coverage under the Policy.

Insurance policies, like all contracts, must be interpreted pursuant to the rules of construction set forth in La. Civ. Code arts. 2045-2057.  *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003).  The Civil Code instructs that "[t]he words of a contract must be given their generally prevailing meaning," La. Civ. Code art. 2047, and where those words "are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  La. Civ. Code, art. 2046.  The court decides whether policy language is clear or ambiguous as a question of law.  *Id.*  A policy provision is ambiguous only if it is "susceptible to two or more *reasonable* interpretations[.]"  *Cadwallader*, 848 So. 2d at 580 (emphasis in original).  The mere fact that a policy could have been worded more clearly does *not* create an ambiguity.  *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 766 (La. 1994).

The Two-Week Hiatus was scheduled in between periods of filming in Brazil and New Orleans, and Alta Vista's Two-Week Hiatus claim therefore falls under the Policy's Principal Photography Cast Protection, which provides as follows:

> WHAT THIS AGREEMENT COVERS
> **Death, injury, or sickness.**   We will pay for loss which you incur that results from any described artist <u>who is prevented</u> by their death, injury or sickness from commencing, continuing, or completing their duties or performances in a covered production.

9

(Emphasis added.)[27]  Under the plain language of this provision, coverage is triggered only when a described artist is "prevented" from performing as a result of injury, sickness or death. Accordingly, pursuant to the rules of contract interpretation set forth above, to be entitled to coverage Alta Vista must come forward with evidence demonstrating that Statham was prevented by his injury or sickness from performing in New Orleans as scheduled.  Summary judgment should be granted in St. Paul's favor because Alta Vista did not -- and cannot -- submit any such evidence.  To the contrary, the evidence upon which Alta Vista relies, as well as Alta Vista's own characterization of that evidence, confirms that at the time the Two-Week Hiatus was called, all parties believed that Statham would be able to film in New Orleans as scheduled. Under these circumstances, Alta Vista had no justification under the Policy for declaring the Two-Week Hiatus, and there is no coverage for any losses associated with that claim.

       i.      *The medical evidence does not demonstrate that Statham was prevented from performing*

First and foremost, none of the medical evidence available to Alta Vista at the time it made the decision to declare the Two-Week Hiatus suggested that Statham would be unable to continue his filming duties when the production shifted back to New Orleans.  To the contrary, Dr. Gerald Berke, Chief of UCLA's Division of Head and Neck Surgery, wrote that it was "highly likely" that Statham would be able to continue filming without any further treatment. And even if additional treatment was required, Dr. Berke was clear that such treatment likely could wait until filming was completed.  In any event, even in the unlikely events that (i) further treatment would be required, and (ii) that additional treatment would require a delay in filming,

---

[27] In contrast, the One-Week Push occurred before filming had commenced and therefore fell -- and was paid -- under the Policy's Pre-Production Cast Coverage, which is triggered where an artist is "prevented by their death, injury or sickness from:  commencing or completing their duties or performances during the pre-production period; or commencing principal photography."  (*See* Ex. 2 at "Section 1-A – Extended Pre-Production Cast Coverage.")

these possibilities would not -- and could not possibly -- become known until April 27, 2009. Nonetheless, armed with only this information, Alta Vista declared the Two-Week Hiatus on April 1, 2009: <u>more than three weeks before Statham's follow-up visit would finally determine whether or not he would be able to perform as scheduled</u>. (Notably, this visit would ultimately confirm that the doctors' prognoses had been correct, and that no further treatment was necessary.[28])

        ii.    *Alta Vista admits that the medical evidence did not demonstrate that Statham was prevented from performing*

Curiously, Alta Vista freely admits that it made the decision to declare the Two-Week Hiatus without any evidence demonstrating that Statham would be unable to perform. In the April 1, 2009 letter explaining the reasoning behind its decision to declare the Two-Week Hiatus, an Alta Vista producer admitted that the decision was made to account for the "highly unlikely," "worst case scenario" that Statham's follow-up visit would reveal the need for further treatment.[29] The letter also admitted that Alta Vista had been "advised that the most likely outcome . . . is that no further treatment will be required," and that, even if further treatment would be required, "it could most likely be postponed until after [Statham] had completed his services on the Picture."[30]

Alta Vista made these same admissions in its subsequent communications with St. Paul. For example, in a June 25, 2009 letter explaining its rationale for declaring the Two-Week Hiatus, Alta Vista explained that the costs involved in "electing" the Two-Week Hiatus "were costs necessarily incurred as a precautionary measure to avoid an immensely higher potential

---

[28] Ex. 14 at. ST. PAUL 000033.

[29] Ex. 13 at ST. PAUL 000016.

[30] *Id.*

11

loss if shooting had to be suspended after it started."[31]  Similarly, in August 2009, Alta Vista explained its position as follows:

> By April 1, 2009, we made the decision to take the 2 week hiatus because it was clear to us, based on the written opinion and prognosis of the medical expert <u>Dr. Berke</u> [see Ex. 9, supra] that Statham <u>might possibly</u> require a minor procedure to re-remove the growth <u>if</u> it had re-occurred in the interim, and, <u>if that was the case</u>, he would again require 2 weeks of voice rest . . . .  In conclusion, we decided on or about April 1, 2009 to create a 2 week hiatus between the shooting of the Picture in Brazil and the start of shooting in New Orleans in order <u>to accommodate the potential unavailability</u> of Jason Statham for a period of up to 2 weeks starting around April 27, 2009."[32]

(Emphases added.)

In sum, Alta Vista admits that there is no coverage under the Policy for any losses allegedly incurred as a result of the Two-Week Hiatus: it admits that it relied on three opinions -- those of Drs. Berke, Sugerman and Schoen -- in making its decision to declare the Hiatus; that these opinions expressed their collective belief that Statham would be able to perform as scheduled and that a 'parade of horribles' would have to occur before Statham would actually be prevented from filming; and that Alta Vista would not know if any, let alone all, of those "horribles" had materialized until April 27, 2009 -- more than three weeks after it decided to declare the hiatus.[33]

---

[31] *See* Ex. 3 at ST. PAUL 000013 – 000014.

[32] *See* August 14, 2009 letter from Trevor Short to Neil Gibson, attached hereto as Ex. 15, at ST. PAUL 000022 - 23.

[33] Alta Vista has also suggested that Jason Statham, through his attorney, purportedly "required" Alta Vista to build in the Two-Week Hiatus under threat of refusal to perform, and that this threat provided Alta Vista with "further" justification for declaring the Hiatus. (*See* August 19, 2009 email from Trevor Short to Neil Gibson, attached hereto as Ex. 16, at ALT 000189 ("Further, Statham himself was not prepared to commit to a continuous schedule (i.e. without the hiatus) so even had we - recklessly - decided to go ahead without the hiatus, he did not agree."); *see also* January 19, 2010 letter from Jacob Bloom to Avi Lerner, attached hereto as Ex. 17, at ALT 000208 (allegedly "confirming" that, in March 2009, Statham had informed Alta Vista that he would be unable to perform unless the Two Week Hiatus were scheduled).

   *iii.*   *Under these circumstances, there is no coverage under the Policy for Alta Vista's decision to declare the Two-Week Hiatus*

In light of the uncontroverted medical evidence, and Alta Vista's admissions concerning the contents of that evidence, Alta Vista's position that the losses it incurred as a result of the Two-Week Hiatus are covered under the Policy is legally untenable. Alta Vista and St. Paul entered into a written contract that specifically required there to be an <u>actual</u> inability to work, not merely the threat of the same, before coverage would be triggered. The Policy does not give Alta Vista the right to unilaterally shut down production, thus subjecting St. Paul to millions of dollars in potentially unnecessary costs, in consideration of an "unlikely" "worst case scenario" in which an actor might be prevented from performing. Rather, the Policy provides coverage where verifiable evidence demonstrates that an actor was actually unable to perform due to injury or sickness. An insured may not voluntarily incur losses to avoid potential later losses that may never (and here, did not) materialize, although this is precisely the course of action chosen by Alta Vista. This is the fundamental disconnect between the parties here. Alta Vista apparently believes that it may justify its actions as allegedly "reasonable under the circumstances"; however, this assertion is belied by the plain language and requirements of the Policy. In the absence of any evidence that Statham's throat condition actually prevented him from filming in New Orleans as scheduled, there is no coverage for any of the losses alleged to have resulted from Alta's Vista's decision to declare the Two-Week Hiatus.[34]

---

Alta Vista's argument is fundamentally flawed. Under no circumstances does the Policy provide coverage for losses incurred as a result of an artist's refusal to perform. In any event, this argument is belied by the contemporaneous documentary evidence: the "side letter agreement" entered into between Statham and Alta Vista imposed no hiatus requirement, and explicitly addresses the possibility of re-scheduling filming of the picture <u>without</u> the Two-Week Hiatus. (*See* March 31, 2009 Agreement between Jason Statham and Alta Vista, attached hereto as Ex. 18, at ALT 005185.)

[34] To that end, Alta Vista also failed to comply with the following Policy requirement:

**D.     Coverage is Also Barred Under the Policy's "Intentional Acts or Direction" Exclusion**

St. Paul is also entitled to summary judgment because the Policy's "Intentional acts or direction" exclusion bars coverage for all losses arising out of Alta Vista's decision to declare the Two-Week Hiatus. That exclusion provides as follows:

> **Intentional acts or direction.** We will not cover loss directly or indirectly caused from your intentional acts or at your direction or with your knowledge.[35]

Here, it is undisputed that Alta Vista purposefully and intentionally declared the Two-Week Hiatus on April 1, 2009, more than three weeks before Statham's follow-up visit would determine whether further treatment for his throat condition would become necessary. As the evidence set forth above makes clear, Alta Vista knew that any delay in filming was very likely not going to be necessary, yet nonetheless made the unilateral decision to declare the Two-Week Hiatus and incur the losses associated therewith. Although Alta Vista now seeks to pass these costs along to St. Paul, these losses arise out of an intentional act done at Alta Vista's direction and are therefore excluded under the clear terms of the Policy.

The purpose of an "intentional acts" exclusion is to "prevent an insured from acting wrongfully with the security of knowing that his insurance company will 'pay the piper' for the

---

> **Notice of potential loss – incapacity and right of medical examination.** Immediately after you are made aware of any described artist being unable to commence or continue their duties as a result of which a claim might result, you agree to . . . procure and immediately forward to us, the certificate of a duly qualified physician which will detail fully the circumstances in which the incapacity results.

(*See* Ex. 2 at "Other Rules for This Agreement.")  Alta Vista failed to send the certificate required by the policy. The only documentation Alta Vista forwarded to St. Paul was in the form of letters from Drs. Berke, Schoen and Sugerman. *See* Exs. 9-11. While these letters detail the circumstances regarding the One-Week Push, they do not describe any "incapacity" preventing Statham from continuing filming as scheduled after that time, during the Two-Week Hiatus.

[35] Ex. 2 at "Common Exclusions – What We Will Not Cover."

damages." *Williams v. City of Baton Rouge*, 731 So. 2d 240, 253 (La. 1999). Although the exclusion is generally applied to deny coverage in third-party liability actions, *see, e.g.*, *id.*, Louisiana courts have recognized that it also applies to defeat first-party claims brought by an insured against his insurer. *See, e.g.*, *Dousay v. Allstate Ins. Co.*, 741 So. 2d 750, 754 (La. App. 3 Cir. 1999) (holding that intentional acts exclusion barred coverage where evidence showed that plaintiff, the insured, intentionally damaged his own vehicle and then sought to have his insurer pay for the loss). Louisiana courts apply a two-pronged balancing test to determine when an intentional acts exclusion is triggered. First, the court will determine if the insured either desired the result of his actions or believed that result was substantially certain to occur. *Williams*, 731 So. 2d at 253-54. Next, the court will consider the insured's reasonable expectations as to the scope of his insurance coverage under the facts of the case. *Id.* at 254. The exclusion will trigger, thus barring coverage, when the insured desires or is substantially certain of the results of his actions and could not reasonably expect those actions to fall within the scope of his insurance coverage. *Id.* at 253-54.

Applying the above, the Policy's intentional acts exclusion operates to bar coverage for any losses Alta Vista incurred as a result of the Two-Week Hiatus. The evidence demonstrates beyond peradventure that on April 1, 2009, Alta Vista decided to declare a Two-Week Hiatus in filming to account for the unlikely possibility that Jason Statham would be unable to perform as scheduled on April 27.[36] Alta Vista is a sophisticated entity that knew that it would incur significant losses as a result of this hiatus, and also knew, or should have known, that under the plain terms of the Policy St. Paul would not pay these losses in the absence of any evidence demonstrating that Statham was actually unable to perform as scheduled. Nonetheless, and

---

[36] *See* pp. 4-6, *supra*.

without any such evidence, Alta Vista elected to declare the hiatus and incur the costs it knew would result. Alta Vista's purposeful decision to incur unnecessary losses, and then pass those unnecessary losses along to St. Paul, is in direct conflict with the Policy's intentional acts exclusion, and coverage is accordingly barred for any losses Alta Vista is alleged to have suffered. *See id.* at 253.

## IV.  CONCLUSION

For the reasons set forth above, St. Paul respectfully requests that its motion for summary judgment dismissing Alta Vista's claims arising out of the Two-Week Hiatus be granted, and for all other relief that this Court deems just and proper.

Respectfully submitted,

/s/*Ralph S. Hubbard III*
**Ralph S. Hubbard III, T.A., La. Bar No. 7040**
**Seth A. Schmeeckle, La. Bar No. 27076**
**Daniel Centner, La. Bar. No. 33055**
**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:    (504) 568-1990
Facsimile:    (504) 310-9195
e-mail:    rhubbard@lawla.com
           sschmeeckle@lawla.com
           dcentner@lawla.com

**ATTORNEYS FOR ST. PAUL FIRE & MARINE INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on <u>20 May 2011</u> a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel by operation of the court's electronic filing system.


          _s/*Ralph S. Hubbard III*_____
          **Ralph S. Hubbard III, La. Bar No. 7040**