UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALTA VISTA PRODUCTIONS, LLC AND ALTA VISTA PRODUCTIONS INC. | CIVIL ACTION |
| VERSUS | NO: 10-1948 |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, ET AL. | SECTION: "S" (3) |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that St. Paul Fire & Marine Insurance Company's Motion for Partial Summary Judgment Regarding Plaintiff's Two Week Production Hiatus Claim (Doc. #40) is **DENIED**.

## BACKGROUND

Plaintiffs, Alta Vista Productions, LLC and Alta Vista Productions Inc., filed this suit against St. Paul Fire & Marine Insurance Company and The Travelers Companies, Inc., to recover sums allegedly owed pursuant to an insurance policy that the defendants issued to plaintiffs to cover losses on the production of the motion picture, *The Expendables*. The motion picture was filmed in Brazil and Louisiana, and the claims involve two of the actors, Jason Statham and Sylvester Stallone.

In January 2009, plaintiffs began preproduction activities for *The Expendables*. Filming was scheduled to begin on March 30, 2009, in Rio de Janeiro, Brazil. After three weeks in Brazil, production was to be moved to New Orleans, Louisiana.

On March 5, 2009, Statham was examined by a physician selected by St. Paul to render a recommendation regarding the insurance coverage. Statham passed the exam. On March 10, 2009, St. Paul agreed to issue the coverage for Statham.

On March 16, 2009, Statham's manager informed plaintiffs that Statham had a medical problem with his throat. The next day, plaintiffs learned that Statham's physician, Dr. Sugarman, found a growth on Statham's vocal cords, Statham was to be treated with antibiotics from March 16, 2009, to March 23, 2009, and that, if the antibiotics were ineffective, he might require surgery, followed by vocal rest for two weeks.

On March 18, 2009, plaintiffs decided to delay the start of production by one week, until April 6, 2009, to permit recovery time if Statham required surgery.

On March 24, 2009, Statham had surgery to remove a benign growth. On March 27, 2009, plaintiffs were informed that Statham was cleared to travel to Brazil, and production began on April 6, 2009.

On March 31, 2009, plaintiffs learned from Statham's management, legal and medical teams that his doctors required him to return to Los Angeles, California for follow up treatment immediately following his return from Brazil on April 27, 2009. On April 1, 2009, three doctors, Dr. Sugarman, Dr. Berke, and Dr. Schoen, informed plaintiffs that it would be unlikely that Statham would require extensive surgery during the production period, but that he could require an in-office laser treatment. If Statham were to require the laser treatment, the doctors opined that he could perform the physical aspects of his part almost immediately, but that it could take up to 14 days after the procedure for his voice to return to normal.

On April 1, 2009, plaintiffs declared a two week production hiatus between the conclusion of production in Brazil and the commencement of production in New Orleans.  Plaintiffs claim that they imposed the two week production hiatus to mitigate the losses that would occur if they began production in New Orleans and were required to halt production after it began due to Statham's throat condition.  At the followup appointment, the doctors determined that Statham did not need any further treatment.

Plaintiffs filed a claim for the two week production hiatus with St. Paul under the insurance policy's principal photography cast coverage, and a claim for the delay in the start of production in Brazil under the policy's preproduction cast coverage .  St. Paul has paid a portion of plaintiffs' loss for the delay in the start of production in Brazil due to Statham's throat condition.  However, St. Paul has not paid any amount on plaintiffs' claim regarding the two week production hiatus in New Orleans.  St. Paul filed a motion for partial summary judgment seeking a ruling that the two week production hiatus is not covered under the policy.

## ANALYSIS

**A.    Summary Judgment Standard**

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The

non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B.**     **Choice of Law**

A federal district court exercising diversity jurisdiction must apply the choice-of-law provision of the forum state to determine which state's substantive laws apply. See Klaxon v. Stentor Elec. Mfg. Co., 61 S.Ct. 1020, 1021 (1941). However, if the laws of the interested states to do not conflict, then no choice-of-law analysis is necessary, and the law of the forum state applies. Mumblow v. Monroe Broadcasting, Inc., 401 F.3d 616, 621 (5th Cir. 2005).

This case involves the interpretation of an insurance policy. The insurance policy was brokered by a Canadian company, Millennium Films Canada, and was underwritten, produced, and delivered in Canada. Also, the insurance policy was bound by Travelers Canada through a subsidiary of St. Paul. The policy insured the production of a motion picture that was filmed in Brazil and New Orleans, Louisiana. One of the insureds, Alta Vista Productions, LLC, is a limited liability company organized under the laws of Louisiana. Thus, Canada and Louisiana each have an interest in having its laws applied to this matter.

Under Louisiana law, the interpretation of an insurance contract is a question of law. See Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 197 F.3d 742, 746 (5th Cir.

2000). The general rules of contract interpretation apply to determine the common intent of the parties to the contract. See Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La.1994). The intent of the parties as reflected in the policy determines the extent of the coverage. Id. The words of an insurance policy are given their "general, ordinary, plain, and proper meaning ... unless [they] have acquired a technical meaning." Id.

When the language is clear and unambiguous, it must be enforced as written. See Reynolds v. Select Props. Ltd., 634 So.2d 1180, 1183 (La.1994). "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046. "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Amoco Prod. Co. v. Tx. Meridian Res. Exploration Inc., 180 F.3d 664, 668-69 (5th Cir. 1999) (quoting Tx. E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998)) (internal quotation marks omitted).  If there is an ambiguity in the policy of insurance, the ambiguous provision is construed against the insurer because it is the party who furnished the text. LA. CIV. CODE ANN. art. 2056.

In Progressive Homes Ltd. v. Lombard Gen. Ins. Co. of Canada, [2010] S.C.C. 33 (Can.), the Supreme Court of Canada recited the general principles of insurance contract interpretation as follows:

> The primary interpretive principle is that when the language of the policy is unambiguous, the court should give effect to clear language, reading the contract as a whole.

> Where the language of the insurance policy is ambiguous, the courts rely on general rules of contract construction. For example, courts should prefer interpretations that are consistent with the reasonable expectations of the parties, so long as such an interpretation can be supported by the text of the policy. Court should avoid interpretations that would give rise to an unrealistic result or that would not have been in the contemplation of the parties at the time the policy was concluded. Courts should also strive to ensure that similar insurance policies are construed consistently. These rules of construction are applied to resolve ambiguity. They do not operate to create ambiguity where there is none in the first place.
>
> When these rules of construction fail to resolve the ambiguity, courts will construe the policy *contra proferentum* - - against the insurer. Once Corollary of the *contra proferentum* rule is that coverage provisions are interpreted broadly, and exclusion clauses narrowly.

The general principles of contract interpretation are similar under Louisiana and Canadian law. Because there is no significant conflict, the law of the forum, Louisiana, will apply.

C.  **St. Paul's Motion for Partial Summary Judgment Regarding the Two Week Production Hiatus**

The insurance policy that St. Paul issued to plaintiffs provides cast coverage for the principal photography[1] period. Pursuant to this coverage, St. Paul agreed:

> We will pay for loss which you incur that results from any *described artist*[2] who is prevented by their death, injury or sickness from

---

[1] The policy defines "principal photography" as "the period of time during which the first camera unit completes the filing of all scenes including the script originally submitted to us, with any by the artist(s)," and it "includes pick-up shooting or the re-shooting of scenes not made necessary by insured losses, that begin and are completed within a four (4) week period from the last day of the original *principal photography*.

[2] The policy defines "described artist" as "an artist specifically named for coverage under this policy." Statham was a described artist.

>> commencing, continuing, or completing their duties or performances in a *covered production*.[3]

Loss is defied as:

>> the amounts by which the *production costs*[4] actually and necessarily incurred in completing *principal photography* for the *covered production* does, as a direct result of an event or series of events covered by the agreement, exceed those *production costs* that would have, but for the happening of such event(s), been incurred.

St. Paul argues that the two week production hiatus is not covered under this provision because Statham was not prevented from performing. St. Paul contends that plaintiffs voluntarily imposed the two week production hiatus in case Statham could not perform, but that because he could, the losses incurred due to the precautionary two week production hiatus are not covered.

St. Paul also argues that coverage for the two week hiatus is excluded under the intentional acts or direction exclusion which provides: "[w]e will not cover loss directly or indirectly caused from your intentional acts or at your direction or with your knowledge." St. Paul argues that the exclusion applies because it was plaintiffs' decision to impose the two week production hiatus.

---

[3] The policy defines "covered production" as:

>> the motion picture, television production, a series of television episodes or other production described on the COVERAGE SUMMARY, whether on film, videotape or any other digital media format.

[4] The policy defines "production costs" as:

>> all costs budgeted specifically for a *covered production*, including such amount of overhead as may be declared as an optional item by you at the time of the declaration of the production. It also includes any loss paid under this policy, however, the additional premium developed by the increase *production costs* is not included.

Plaintiffs argue that the two week production hiatus was instituted because of Statham's original medical condition and the recommendations of his physicians. Plaintiffs argue that the two week production hiatus was necessary because Statham's doctors were unsure whether his voice would be restricted following the follow up doctor's visit. As of the time plaintiffs instituted the two week production hiatus, they had received letters from Statham's doctors in which the doctors opined that it was possible that Statham would require a laser procedure at the April 27, 2009, followup appointment, and that the procedure would affect Statham's voice. Plaintiffs argue that it is inconsistent for St. Paul to find that the delay in the beginning of production that was necessary because of Statham's throat condition is covered, but that the two week production hiatus is not when both decisions were made before Statham's condition was fully known. Plaintiffs argue that it took both actions to mitigate the damages that would have occurred if Statham were prevented from performing after starting production. Plaintiffs argue that St. Paul cannot deny coverage for the two week production hiatus when it would have been exposed to a much larger loss if production had commenced and had to be interrupted in case Statham had required a medical procedure on April 27, 2009, and could not perform for two weeks thereafter.[5]

The insurance policy required plaintiffs to notify St. Paul of potential losses:

> Immediately after you are made aware of any *described artist* being unable to commence or continue their duties as a result of which a *claim*[6] might result, you agree to:

---

[5] The parties argue that the cost of delaying production is $1,100,000, and estimate that the cost of a cessation of production would have been $5,200,000.

[6] The policy defines "claim" as "a demand in which damages are alleged."

- notify us;

- procure and immediately forward to us, the certificate of a duly qualified physician which will detail fully the circumstances in which the incapacity results; and

- ensure and preserve to us, the continuing right of examination, at all reasonable times by our own appointed physician, of an *described artist* whose incapacity may lead to a loss.

Further, the policy states that "if there is a loss that may be covered by protection provided in this policy" the insured must "(d)o what is reasonably necessary to protect covered property from further damage."

This language clearly demonstrates that, when entering into the insurance contract, the parties anticipated that there are situations where a claim might arise due to a unpredictable health issue. The policy requires plaintiffs to notify St. Paul of potential losses, presumably so that St. Paul could be involved in plotting a course of action that would minimize losses. The policy also requires the insured to mitigate damages if a loss might be covered. At the time plaintiffs' made the decision to institute the two week production hiatus, Statham's doctors, including one appointed by St. Paul, concurred that it was possible that he could require a laser procedure on April 27, 2009, which could affect his voice for two weeks. Whether the decision to delay the start of production in New Orleans to avoid a much more costly cessation of production was a reasonable decision and comports with the policy requirements is an issue of fact for the jury to determine. Therefore, St. Paul is not entitled to summary judgment on the issue of whether the two week production hiatus is covered under the policy.

## CONCLUSION

**IT IS HEREBY ORDERED** that St. Paul Fire & Marine Insurance Company's Motion for Partial Summary Judgment Regarding Plaintiff's Two Week Production Hiatus Claim (Doc. #40) is **DENIED**.

New Orleans, Louisiana, this  21st  day of June, 2011.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**